IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2007 JAN -9 P 4: 35

| | |
|---|---|
| RONALD E. MAYS, MONTGOMERY JET CENTER, INC., AND SOUTHERN SKIES, INC., <br><br> Plaintiffs, <br><br> v. <br><br> ALEX ST. JAMES, and US FED GROUP, and U.S. DEPARTMENT OF TRANSPORTATION, <br><br> Defendants. | CIVIL ACTION NO.: 2:07CV33-WHA |

## NOTICE OF REMOVAL

PLEASE TAKE NOTICE that pursuant to 28 U.S.C. § 1442 (a)(1), defendant the United States Department of Transportation, by and through Leura G. Canary, United States Attorney for the Middle District of Alabama, hereby removes this action from State Court to this Court. In support of this removal, the U.S. Department of Transportation states as follows:

1. The U.S. Department of Transportation is a named defendant in the above-captioned civil action filed in the Circuit Court of Montgomery County, Alabama, Civil Action No. CV-2006-3063. In accordance with 28 U.S.C. § 1446, copy of all process, pleadings, and orders served upon the United States are attached.

2. Title 28 U.S.C. § 1442 (a)(1) provides that any civil action commenced in a State court against the "United States or any agency thereof" may be removed to the

District Court. The Department of Transportation is an executive department of the United States. 49 U.S.C. § 102.

3. Although their complaint is not a model of clarity, plaintiffs appear to be seeking injunctive relief to prevent anticipated regulatory action by the Department of Transportation. *See*, Complaint ¶¶ 8, c. The Department of Transportation's regulatory authority is enumerated in Title 49 of the United States Code and Code of Federal Regulations. These statutes and regulations provide a colorable federal defense to this action. *See, Mesa v. California*, 489 U.S. 121, 133 (1989). In addition, this action is not yet ripe because plaintiff does not allege that the Department of Transportation has actually taken any action against them. *See, National Park Hospitality Assoc. v. Dept. of the Interior*, 538 U.S. 803, 807-08 (2003)(holding that ripeness doctrine is drawn from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction). The doctrine of ripeness also provides a colorable *Mesa* defense.

WHEREFORE, the defendant United States Department of Transportation prays that the above-captioned case pending in the Circuit Court of Montgomery County, Alabama, as Case No. CV 2006-3063 be removed to this Court pursuant to 28 U.S.C. § 1442 (a)(1).

Respectfully submitted this 9th day of January, 2007.

          LEURA G. CANARY
          United States Attorney

By: _____
      STEPHEN M. DOYLE
      Chief, Civil Division
      Assistant United States Attorney
      Attorney for U.S. Department of Transportation
      Post Office Box 197
      Montgomery, AL 36101-0197
      District of Columbia Bar No. 422474
      Telephone No.: (334) 223-7280
      Facsimile No.: (334) 223-7418
      **E-mail: stephen.doyle@usdoj.gov**

## CERTIFICATE OF SERVICE

I hereby certify that I have this date served a copy of the foregoing Notice of Removal upon plaintiffs' attorney by mailing a copy of same, first class, postage prepaid, addressed as follows:

    William H. Turner, Esquire
    449 South McDonough Street
    Montgomery, Alabama 36104

Dated this 9th day of January, 2007.

                        _____
                        Assistant United States Attorney

Received 12/19/06

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

RONALD E. MAYS, MONTGOMEY )
JET CENTER, INC., and SOUTHERN )
SKIES, INC., ) )
    PLAINTIFFS )
)
V. )   Case No. CV 2006 - 3063
)
)
ALEX ST. JAMES, and US FED GROUP, )
and U.S. DEPARTMENT OF TRANS- )
PORTATION, )
    DEFENDANTS )

## SUMMONS

To any sheriff or any person authorized by either Rule 4.1 (b)(1); 4.1(b)(2); 4.2(b)(1); or 4.2(b)(2) of the Alabama Rules of Civil Procedure to effect service.

You are hereby commanded to serve this summons and a copy of the complaint in this action upon:
    Ms. Lisa Swafford-Brooks, Sr. Trial Attorney, Avn Enf
    U.S. DEPARTMENT OF TRANSPORTATION
    400 Seventh Street, South West
    Washington, District of Columbia 20590, USA

NOTICE TO DEFENDANT: The complaint which is attached to this summons is important and you must take immediate action to protect your rights. You are required to mail or hand deliver a copy of a written Answer, either admitting or denying each allegation in the complaint, to:

    WILLIAM H. TURNER
    449 South McDonough Street
    Montgomery, Alabama 36104

the lawyer for the Plaintiffs. This Answer must be mailed or delivered within 30 days after this summons and complaint were delivered to you, or a judgment by default may be entered against you for the money or other things demanded in the complaint. You must also file the original of your Answer with the Clerk of this Court within a reasonable time afterward.

Dated 12-8-06

_____
Clerk of Court

Civil Plaintiff.Summons.Oji4

IN THE CIRCUIT COURT OF
MONTGOMERY COUNTY, ALABAMA

RONALD E. MAYS, MONTGOMERY )
JET CENTER, INC., and SOUTHERN )
SKIES, INC., )
       PLAINTIFF )
   )
V. )      Case No. CV 2006 - ____
 )
ALEX ST. JAMES, and US FED GROUP, )
and U.S. DEPARTMENT OF TRANS- )
PORTATION )
 )
       DEFENDANTS )

## COMPLAINT

1. Plaintiff RONALD E. MAYS, is the owner and Chief Executive Officer of both Montgomery Jet Center, Inc., and Southern Skies, Inc., hereinafter referred to as Plaintiff(s), and is a resident of the great state of Alabama.

2. Defendant ALEX ST. JAMES and US FED GROUP, to the information and belief of Plaintiffs, are resident citizens of the common wealth of Washington, D.C., hereinafter referred to as Defendant St James, et. al.

3. Defendant U.S. DEPARTMENT OF TRANSPORTATION, is a department of the Federal Government, hereinafter referred to as Dept of Trans.

4. Plaintiffs, on and between November, 2005 and January, 2006, entered into an agreement whereas Plaintiffs were to provide consultation services and thereafter to arrange, or broker a charter trip for Defendant St. James, et. al.

5. The document containing said Agreement is included with this complaint.

6. A prepay of $40,000.00 was the pay for the consultation services, and Defendant St. James, et. al., were to continue to pay toward the charter. Once the $40,000.00 was paid, Plaintiffs initiated contact with carriers for the charter.

7. Defendant St. James, et. al., did not consummate their payments as required, therefore the charter trip that Defendant St. James, et. al., advertised for did not go, therefore monies paid by customers of St. James, et. al., was due to be refunded. Plaintiffs did not advertise to attract any of Defendant St. James, et. al., customers, nor did Plaintiffs received any monies from any of Defendant St. James, et. al., customers.

8. Since this was a flight involving air commerce, Defendant U. S. Department of Transportation, involved the government to insure that the potential passengers (customers) of Defendant St. James, et. al., receives a refund.

WHEREFORE PLAINTIFFS DEMANDS THE FOLLOWING RELIEF:

a. That the Court construe the pertinent provisions of the agreement, signed by the parties to the agreement, take evidence as to the actions of the parties.

b. That the Court interpret the specific provisions and conditions herein recited in said agreement and the actions of the parties to the agreement, and by its judgment declare that the Plaintiffs are under no obligation, duty or liability to pay or refund any monies to the potential passengers (customers) of Defendant St. James, et. al., and

c. That Plaintiff further prays that, pending the decision of this Court herein, that this Court will grant to Plaintiff a temporary injunction, enjoining Defendant U. S. Department of Transportation from proceeding further in said action pending further Orders of the Court.

Respectfully submitted,

William H. Turner
Attorney for Plaintiffs

**ADDRESS OF ATTORNEY:**
449 South McDonough Street
Montgomery, Alabama 36104
Telephone: (334) 265-7818
Telefax:     (334) 265-7860


Civil Plaintiff MJC SS . RM



## AIR TRANSPORTATION CHARTER SERVICE AGREEMENT

### AMONG

### AFRICA UNITED STATES FRIENDSHIP & ECONOMIC DEVELOPMENT GROUP

### And

### MONTGOMERY JET CENTER/SOUTHERN SKIES AIRLINES, INC.

### As of November 17, 2005  1/3/06

This Agreement is made this 3rd day of January, 2006 among Africa United States Friendship & Economic Development Group with its principal place of business at 1201 Pennsylvania Avenue, North West, Suite 300, Washington, DC 20004-2436, herein referred to as "Sponsor" and Montgomery Jet Center/Southern Skies Airlines, Inc., with its principal place of business at 4601 Richardson, Road, Montgomery, Alabama, 36108, referred to as "Charter Carrier".

Whereas the Sponsor wishing to engage the service of Southern Skies, Charter Carrier, and its owner, Ron Rays, and his assigns for the services to the terms and conditions provided in this Air Transportation Charter Service Agreement, and further defined in any Agreement Supplements and addendum, each to be approved in writing to this Air Transportation Charter Service Agreement, and Southern Skies, Inc., wishing to provide such services as operator to this Air Transportation Charter Service Agreement subject to the Terms and conditions provided in this Air Transportation Charter Service Agreement.

NOWTHEREFORE, the parties hereto agree as follows:

### 1. DEFINITIONS:

In Terms and Conditions the words this "Agreement" shall mean the Air Transportation Charter Service Agreement, the principle terms of which are set out herewith and of which these Terms and Conditions form part; the "Carrier" shall mean the aircraft charter carrier who carries the Client; "the Client" includes any passenger and their baggage carried on the aircraft; "Sponsor" shall mean Africa United States Friendship & Economic Development Group, interchangeably if any US FED Group, and A US FED Group; "Aircraft" shall mean the charter aircraft specified herein; "Schedule" shall mean the flight or any series of flights agreed between US FED Group and the Client and Charter Carrier including places of departure, places of destination, any stopping points, any departures and arrival times and any part agreed functions; the "Charter Price" shall mean the amount payable to Charter Carrier by the Client for services

supplied under this Agreement; "Standard Charges" shall mean the prices offered by Charter Carrier hereto. Words and expressions defined below shall have the same meaning in these Conditions. The headings in this agreement are for convenience only and shall not affect its interpretation.

## 2. AIR TRANSPORTATION CHARTER SERVICES:

The Charter Carrier, Montgomery Jet Center/Southern Skies Airlines, Inc., shall provide the following services;

2.1  Provide all technical services and representation for Sponsor for acquisition(s) of Trans-Atlantic non-stop aircraft from Washington-Baltimore International Airport (BWI), Baltimore, Great State of Maryland, to Roberts International Airport (ROB), Republic of Liberia, commencing on January 9, 2006, for an indefinite time and as agreed to in this Agreement.

2.2  Southern Skies, Inc., services shall include commercial and or personal aircraft, handle all logistics for the implementation including FAA and DOT requirements and any and all other requirements necessary for regular charter air service between BWI and ROB and all other stops to be determined in the future, regular schedule flights and or charter service flights, and handle the entire operation for as long as Sponsor desires.

2.3  A prepaid "Draw Account" of $40,000.00 will be forwarded via escrow initially by the Sponsor to the Charter Carrier, Montgomery Jet Center/Southern Skies, Inc. The terms to this deposit is determined in this Agreement.

2.4  The remaining balance will be used on this draw and additional transfers into escrow as a draw allowance condition for all expenses which are necessary in the implementation of this Agreement. Charter Carrier shall make additional draw requests as is allowed herein not to exceed one half of the Charter Price.

2.5  A payment not in excess of and up to $195,000.00 Charter Completion fee shall be due completion of the first flight of January 9, 2006. All and any additional air transportation charter services the Sponsor desires the Charter Carrier to manage and operate shall be charged an additional $55,000 per month and considered executed under this Agreement recorded in an Additional Supplement.

### 3. INDEPENDENT CONTRACTOR:

Montgomery Jet Center/Southern Skies, Inc., will act as independent contractor under the direction of the Sponsor. Nothing in Agreement will be construed so as to create a partnership or joint venture; and neither party will be liable for debts or obligations of the other. Any arrangements made by Charter Carrier with any broker, subcontractor, other parties or persons with whom the Charter Carrier is involved are the responsibility of the Charter Carrier. Upon payment by the Company to the contractor of the compensation as detailed in this Agreement, the Charter Carrier will hold the Sponsor harmless from any and all claims, liabilities, commissions, fees, or expenses in conjunction with the payment of such remuneration from any party who alleges a relationship with or through the Charter Carrier.

### 4. CONFLICT OF INTEREST:

Montgomery Jet Center/Southern Skies, Inc., agrees not to enter into any Agreements or arrangements with any other Sponsor, Company, Interests, Governments, parties inclusive mentioned and or not mentioned here as party to any form of charter or regular air transport service which may create a conflict of interest in the relations with Sponsor in this Agreement as party herein during its relationship as representation of Sponsor as specified herein or for at least 6 years in the event of the termination of this Agreement.

### 5. NON-COMPETITION:

This Air Transportation Charter Service Agreement as of November 17, 2005, (as amended, supplemented, waived or otherwise modified from time to time in accordance with its terms, this "Agreement"), among US FED Group and Montgomery Jet Center/Southern Skies, Inc., parties hereto.

- 5.1 Acknowledges that either both parties, but specifically US FED Group is currently obligated to protect the value of its Member Firm(s) through certain non-competition and confidentiality covenants (the "Current Agreements"); and
- 5.2 Each party acknowledges and agrees that, in connection with and as a result of the Agreement, each and such party to this Agreement will materially benefit from each party; and
- 5.3 Each party acknowledges and agrees that the consideration such party herein will receive in connection with the Agreement is in exchange for the parties interests in its or member firm(s) that the party is transferring directly or indirectly to Montgomery Jet Center/Southern Skies, Inc.; and

5.4 Each Partner acknowledges and agrees that it is essential to the success of this Initial Air Transportation Charter Service Agreement representation by Montgomery Jet Center/Southern Skies, Inc., and the future of same representation in toto inclusive with all regulatory agencies necessary for and of the implementation of this Air Transportation Charter Service Agreement, and it will be so represented in connection therewith by Montgomery Jet Center/Southern Skies, Inc., that US FED Group member firm(s) interests that are being transferred by the Sponsor to Montgomery Jet Center/Southern Skies, Inc., only in connection with this Agreement be protected by this non-competition provision and section so enumerated similar to the Current Agreements; and

5.5 Each Partner acknowledges and agrees that in connection with the Agreement, and in the course of such subsequent services contracted to Montgomery Jet Center/Southern Skies, Inc., with A US FED Group or its affiliates, the Charter Carrier has been and will be provided with access to sensitive and proprietary information about the clients, prospective clients, knowledge capital and business practices of A US FED Group or its affiliates, and has been and will be provided with the opportunity to develop relationships with clients, prospective clients, employees and other agents of A US FED Group or its affiliates, and Montgomery Jet Center/Southern Skies, Inc., further acknowledges that such proprietary information and relationships are extremely valuable assets in which US FED Group or its affiliates have invested and will continue to invest substantial time, effort and expense and which represent a significant component of the value of business plans to the other member firm(s) of A US FED Group and the owners of each member firm(s); and

5.6 Each party acknowledges and agrees that the other member firm(s) owners of A US FED Group and individual owners personally and collectively, would suffer significant and irreparable harm from Montgomery Jet Center/Southern Skies, Inc., and or assign or new entities directly or indirectly authorized and disguised under another party competing with A US FED Group or its affiliates for a period of time after the initiation of this Air Transportation Charter Service or after the termination of the Montgomery Jet Center/Southern Skies Airlines, Inc., Service Agreement herewith or its affiliates; and

5.7 Each party agrees that it is willing to enter into this Agreement on the basis of, and in consideration of, all or substantially all of the US FED Group and its member firm(s) entering into this Agreement or similar agreements; and

5.8 In further consideration of this non-compete provision it is a condition precedent to each party participating in and under this Agreement that such party agree to be bound by the covenants contained herein;

5.9 Hence, for good and valuable consideration, each party A US FED Group and Montgomery Jet Center/Southern Skies, Inc., (each, a "Party"; collectively, the "Parties"), hereby covenant and agree to

the following restrictions which the parties acknowledges and agrees are reasonable and necessary for the other owners of US FED Group and the owners of Montgomery Jet Center/Southern Skies Airlines, Inc., to have and enjoy the full benefit of the business interests acquired in connection with this Agreement in toto and which will not unnecessarily or unreasonably restrict such party's professional opportunities should its contractual charter Agreement with A US FED Group or its affiliates terminate:

**Section 1. Non-Competition Specified Clauses:**

(a) Each Party shall not, for a period ending on the later of five (5) years following the date of the Agreement, or eighteen (18) months following the termination of Montgomery Jet Center/Southern Skies Airlines, Inc., with A US FED Group or any of its affiliates (the "Restricted Period"):

(i) associate (including, but not limited to, association as a sole proprietor, owner, employer, partner, principal, investor, joint venturer, shareholder, associate, employee, member, consultant, contractor or otherwise) with any Competitive Enterprise or any of the affiliates, related entities, successors, or assigns of any Competitive Enterprise and in connection with such association engage in Consulting Services, provided, however, that with respect to the equity of any Competitive Enterprise which is or becomes publicly traded, such party's ownership as a passive investor of less than 1% of the outstanding publicly traded stock of a Competitive Enterprise shall not be deemed a violation of Section 1(a)(i) of this Agreement;

(ii) directly or indirectly (a) solicit, or assist any other individual, person, firm or other entity in soliciting, any Client or Prospective Client for the purpose of performing or providing any Consulting Services; or (b) perform or provide, or assist any other individual, person, firm or other entity in performing or providing, Consulting Services for any Client or Prospective Client; or (c) interfere with or damage (or attempt to interfere with or damage) any relationship and/or agreement between A US FED Group or any of its affiliates and a Client or Prospective Client; or

(iii) directly or indirectly, solicit, employ or retain, or assist any other individual, person, firm or other entity in soliciting, employing or retaining, any employee or other agent of US FED Group or any of its affiliates, including, without limitation, any former employee or other agent of US FED Group or any of its affiliates or any of their predecessors (including, but not limited to, A US FED Group and any of its affiliates) who ceased working for US FED Group or any of its affiliates or any of their predecessors within an eighteen month period before or after the date on which such party's employment with A US FED Group or any of its affiliates terminated, in connection with or for the purpose of performing or providing Consulting Services.

(b) For purposes of this Agreement, the following definitions shall apply:

(i) The term "Act" shall mean the Securities Exchange Act of 1934, as amended, or any successor thereto.

## Section 2. Remedies Upon Breach:

### (a) Damages

Each party agrees that if such party were to breach any provisions of this Agreement, A US FED Group would suffer damages that are not readily ascertainable. Accordingly, in addition to and without limiting any remedies in law or in equity that may be available to A US FED Group for the breach of this Agreement, including, but not limited to, injunctive and other equitable relief, each party agrees that in the event of a breach of this Agreement by such party, as reasonably determined by the Board of Directors of A US FED Group, such Party shall pay to A US FED Group immediately following such determination and a written demand therefor, a cash payment in the amount designated for such party on Appendix B hereto or such lesser amount as may be designated by the Board of Directors of A US FED Group in its sole and absolute discretion, as and for liquidated damages ("Liquidated Damages"). Each Party acknowledges and agrees that the payment required by this Section is a reasonable forecast of the damages likely to result from such breach and is not a penalty of any kind.

Each party agrees that the Liquidated Damages shall be secured by the shares of A US FED Group received by the party in the Agreement, pursuant to the Pledge Agreement dated as of the date hereof, attached as Appendix C hereto ("Pledge Agreement"), which is incorporated herein by reference and made a part of this Agreement.

Each party further agrees that the payment of Liquidated Damages shall not be construed as a release or waiver by A US FED Group, of the right to prevent the continuation of any such breach of this Agreement in equity or otherwise and shall not preclude or be construed to preclude A US FED Group from making a showing of irreparable injury or any other element that may be necessary to secure injunctive relief.

### (b) Injunctive Relief

Each party acknowledges and agrees that A US FED Group remedy at law for any breach of the covenants contained herein would be inadequate and that for any breach of such covenants, A US FED Group shall, in addition to other remedies as may be available to it at law or in equity, or as provided for in this Agreement, be entitled to an injunction, restraining order, or other equitable relief, without the necessity of posting a bond, restraining the party from committing or continuing to commit any violation of the covenants. Each party agrees that proof shall not be required that monetary damages for breach of the provisions of this Agreement would be difficult to calculate and that remedies at law would be inadequate.

## Section 3. Governing Law

This Agreement and the rights and duties of the parties thereunder shall be governed by and construed and enforced in accordance with the laws of each of party's jurisdiction, without regard to principles of conflicts of laws. This

Agreement and understanding of the parties hereto and supersedes all prior or contemporaneous oral or written Agreements regarding the subject matter hereof. Any action or proceeding seeking to enforce any provision of, or based on any right arising out of, may be brought against either party in the United States District Court of and for each party's principal place of business and or the District of Columbia, Washington. In the event of any actual or threatened breach by Montgomery Jet Center/Southern Skies Airlines, Inc., and or its assign, or its obligations imposed by this Agreement, Charter Carrier, Montgomery Jet Center/Southern Skies Airlines, Inc., agrees to A US FED Group application of and the granting of a temporary restraining order and preliminary injunctive relief to prevent or minimize such breach, and Montgomery Jet Center/Southern Skies Airlines, Inc., shall be responsible for all damages suffered by A US FED Group by reason of such breach and any costs and expenses (including, without limitation, attorney's fees) incurred by/to A US FED Group in connection with enforcement of this Agreement. The same remedies are available to Montgomery Jet Center/Southern Skies Airlines, Inc., in the District of Washington. This Agreement is mutually binding making each party accountable to the other.

**Section 4. Resolution of Disputes**

   (a) Any and all disputes arising out of, relating to or in connection with this Agreement and/or the Pledge Agreement (together, the "Agreements"), including, but not limited to, disputes relating to the validity, negotiation, execution, interpretation, performance or non-performance of the Agreements (including the validity, scope and enforceability of this arbitration provision), shall be finally settled by arbitration conducted by a single arbitrator in District of Columbia, Washington. The proceedings shall be conducted pursuant to the then-existing Rules of Arbitration of the International Chamber of Commerce, except that the parties may select an arbitrator who is a resident of the same State as one of the parties. If the parties to the dispute fail to agree on the selection of an arbitrator within thirty (30) days of the receipt of request for arbitration, either party may apply to the International Chamber of Commerce to make the appointment. The arbitrator shall be a lawyer and shall conduct the proceedings in the English language.

   (b) Notwithstanding the provisions of Paragraph (a) of this Section 4, A US FED Group may bring an action or special proceeding in any court of competent jurisdiction for the purpose of compelling a partner to arbitrate, seeking temporary or preliminary relief pending resolution of a dispute between the parties and/or enforcing an arbitration award, and, for the purposes of this Paragraph (b), each party (i) expressly consents to the application of Paragraph (c) of this Section 4 to any such action or proceeding and (ii) irrevocably appoints the General Counsel of A US FED Group, at its principal place of business (or, if different, the then-current principal business address of the duly appointed General Counsel of A US FED Group) as such party's agent for service of process in connection with any such action or proceeding and agrees that service of process upon such agent, who shall promptly advise such party of any such service of process, shall be deemed in every respect effective service of process upon the party in any such action or proceeding.

(c) (i) The parties hereby irrevocably submit to the non-exclusive jurisdiction of the courts of the District of Columbia, Washington and the courts of the United States of America located in the District of Columbia, Washington for the purpose of any judicial proceeding brought in accordance with the provisions of Paragraph (b) of this Section 4, or any judicial proceeding ancillary to an arbitration or contemplated arbitration arising out of or relating to or concerning the Agreements. Such ancillary judicial proceedings include any suit, action or proceeding to compel arbitration, to obtain temporary or preliminary judicial relief in aid of arbitration, or to confirm an arbitration award. The parties acknowledge that for a designated by this Paragraph (c) has a reasonable relation to the Agreements, and to the parties' relationship with one another.

(ii) The parties hereby waive, to the fullest extent permitted by applicable law, any objection which they now or hereafter may have to personal jurisdiction or to the laying of venue of any such ancillary suit, action or proceeding brought in any court referred to in Paragraph (c)(i) of this Section 4, and the Parties agree not to plead or claim the same.

**Section 5. Amendment; Waiver**

This Agreement may not be modified, other than by a written agreement executed by the Montgomery Jet Center/Southern Skies Airlines, Inc. and A US FED Group, nor may any provision hereof be waived other than by a writing executed by A US FED Group.

The waiver by A US FED Group of any particular default by a party shall not affect or impair the rights of A US FED Group with respect to any subsequent default of the same or of a different kind by such party or a different party; nor shall any delay or omission by A US FED Group to exercise any right arising from any default by a party affect or impair any rights that A US FED Group may have with respect to the same or any future default by such party or a different party.

**Section 6. Notice**

(a) Any communication, demand or notice to be given hereunder will be duly given (and shall be deemed to be received) when delivered in writing by hand or first class mail or by telecopy to a party at its address as indicated below:

(b) Place of Business of Africa United States Friendship & Economic Development Group:

1201 Pennsylvania Avenue, North West, Suite 300

Washington, District of Columbia 20004-2436

(c) Place of Business of Montgomery Jet Center/Southern Skies Airlines, Inc.:

4601 Richardson Road

Montgomery, AL 36108

**(d)** A US FED Group shall be responsible for notifying each party of the receipt of a communication, demand or notice under this Agreement relevant to such party, in writing, at the address of such party then in the records of US FED Group (and each party shall notify Sponsor of any change in such address for communications, demands and notices) or by electronic mail to the principal electronic address of such person maintained by A US FED Group.

**(c)** Unless otherwise provided to the contrary herein, any notice which is required to be given in writing pursuant to the terms of this Agreement may be given by telecopy.

### Section 7. Severability

If any provision of this Agreement shall be held or deemed to be invalid, illegal, or unenforceable in any jurisdiction, for any reason, the invalidity of that provision shall not have the effect of rendering the provision in question unenforceable in any other jurisdiction or in any other case or of rendering any other provisions herein unenforceable, but the invalid provision shall be substituted with a valid provision which most closely approximates the intent and the economic effect of the invalid provision and which would be enforceable to the maximum extent permitted in such jurisdiction or in such case.

### Section 8. Change in Control

Notwithstanding any provision in this Agreement to the contrary, this Agreement shall terminate in the event of a Change in Control after the Agreement.

### Section 9. Entire Agreement

This Agreement and the Pledge Agreement not contain herein but in subsequent supplement to be executed due to time constraints and non-evasive to harm the entire Agreement between the Parties with respect to the subject matter therein and supersede all prior oral and written agreements between the Parties pertaining to such matters

### Section 10. Further Assurances

Each party agrees to execute all such further instruments and documents and to take all such further action as may be reasonably necessary to effect the terms and purposes of this Agreement.

### 6. CONFIDENTIALITY:

The Charter Carrier hereby acknowledges that the trade secrets, confidential information and how-how (hereinafter referred to as "Proprietary Information) developed and acquired by the Sponsor and vice versa Montgomery Jet Center/Southern Skies Airlines, Inc., are among its most valuable assets and the value of such Proprietary Information may be destroyed by unauthorized disclosure of Proprietary Information. All information imparted to or learned by the Contractor, Montgomery Jet Center/Southern Skies Airlines, Inc., with respect to the Sponsor (whether

(ii) The term "Beneficial Owner" shall mean a beneficial owner as such term is defined in Rule 13d-3 under the Act (or any successor rule thereto).

(iii) The term "Board" shall mean the Board of Directors of US FED Group and or its member firm(s).

(iv) The term "Change in Control" shall mean the occurrence of any of the following events:

(a) any Person (other than (i) a Person holding securities representing 10% or more of the combined voting power of US FED Group non-public outstanding securities as of the date of this Agreement (a "Pre-Existing Shareholder"), (ii) A US FED Group, any trustee or other fiduciary holding securities under an employee benefit plan of A US FED Group, or (iii) any company owned, directly or indirectly, by the shareholders of A US FED Group in substantially the same proportions as their ownership of shares of US FED Group becomes the Beneficial Owner, directly or indirectly, of securities of A US FED Group representing (I) 20% or more of the combined voting power of A US FED Group then-outstanding securities and (II) more of the combined voting power of A US FED Group then-outstanding Shares than the Pre-Existing Shareholders in the aggregate;

(b) during any period of twenty-four consecutive months (not including any period prior to this Agreement), individuals who at the beginning of such period constitute the Board, and any new director (other than a director nominated by any Person (other than A US FED Group) who publicly announces an intention to take or to consider taking actions (including, but not limited to, an actual or threatened proxy contest) which if consummated would constitute a Change in Control under (a), (c) or (d) of this Section 1(h)(iv)) whose election by the Board or nomination for election by A US FED Group shareholders was approved by a vote of at least two-thirds of the directors then still in office who either were directors at the beginning of the period or whose election or nomination for election was previously so approved, cease for any reason to constitute at least a majority thereof;

(c) the consummation of any transaction or series of transactions resulting in a merger or consolidation, in which A US FED Group is involved, other than a merger or consolidation which would result in the shareholders of A US FED Group immediately prior thereto continuing to own (either by remaining outstanding or by being converted into voting securities of the surviving entity), in the same proportion as immediately prior to this Agreement(s) or supplements, more than 50% of the combined voting power of the voting securities of A US FED Group or such surviving entity outstanding immediately after such merger or consolidation; or

(d) the complete liquidation of A US FED Group or the sale or disposition by A US FED Group of all or substantially all of US FED Group assets, other than a liquidation of A US FED Group into a wholly-owned subsidiary.

(v) The term "Client" shall mean any person, firm, corporation or other organization whatsoever for whom A US FED Group or any of its affiliates or any

of their predecessors (including, but not limited to, US FED Group and its affiliates) provided services within an eighteen month period before or after the date on which the party's Air Transportation Charter Service Agreement with A US FED Group or any of its affiliates terminated.

(vi) The term "Competitive Enterprise" shall mean a business enterprise that engages in, or owns or controls a significant interest in any entity that engages in, the performance of services of the type provided by A US FED Group or any of its affiliates or any of their predecessors (including, but not limited to, US FED Group and its affiliates) at any time, past, present or future. "Competitive Enterprise" shall include, but not be limited to, the entities set forth on Appendix A hereto. A US FED Group may publish to the parties from time to time a revised Appendix A.

(vii) The term "Consulting Services" shall mean the performance of any services of the type provided by A US FED Group or any of its affiliates or any of their predecessors (including, but not limited to, US FED Group and its affiliates) at any time, past, present or future.

(viii) The term "employment" shall mean employment by and/or engagement with A US FED Group or any of its affiliates.

(ix) The term "Parties" (each, a "Party") shall mean those persons other than A US FED Group who agree to be bound by these non-competition provisions hereby.

(x) The term "Person" shall mean a person as such term is used for purposes of Section 13(d) or 14(d) of the Act.

(xi) The term "Prospective Client" shall mean any person, firm, corporation, or other organization whatsoever with whom A US FED Group or any of its affiliates or any of their predecessors (including, but not limited to, US FED Group and its affiliates) have had any negotiations or discussions regarding the possible performance of services within the eighteen months preceding the Montgomery Jet Center/Southern Skies, Airlines, Inc.'s termination of this Agreement with A US FED Group or any of its affiliates.

(xii) The term "Shares" shall mean the Class A common shares of A US FED Group.

(xiii) The term "solicit" shall mean to have any direct or indirect communication of any kind whatsoever, regardless of by whom initiated, inviting, advising, encouraging or requesting any person or entity, in any manner, to take or refrain from taking any action.

(c) Each party's Country Company Managing Director is authorized to waive any or all of the foregoing restrictions, or any portion thereof, provided, however, that the Country Company Managing Director must first obtain the written consent to such waiver of the Chief Executive Officer of A US FED Group, who may grant or withhold such consent in his or her sole and absolute discretion.

acquired before or after the date hereof) will be deemed to be confidential Proprietary Information and will not be used or disclosed by the Contractor, Charter Carrier, Montgomery Jet Center/Southern Skies Airlines, Inc., except to the extent necessary to perform its duties hereunder, and in no event disclosed to anyone, except as allowed by the Sponsor to parties, outside this contractual Air Transportation Charter Service Agreement of Charter Carrier, Montgomery Jet Center/Southern Skies Airlines, Inc., unless such Proprietary Information is or has been made generally available to the public or except where there is express written authorization to disclose such Proprietary Information by the Sponsor. Upon termination of this Agreement for any reason, the Contractor, Montgomery Jet Center/Southern Skies Airlines, Inc. will not retain any documents or tangible property containing or reflecting Proprietary Information, except for those required by law.

**7. ASSIGNMENT:**

This Agreement will inure to the benefit of and will be binding upon each of the parties hereto. Neither party, without prior written consent of the other party, may assign, subcontract, or delegate the performance of service under this Agreement wholly or in part.

**8. DURATION AND TERMINATION:**

The effective date of this Agreement is upon execution and will continue in full force indefinitely, unless terminated by either party with 45 days prior written notice. Any termination of this Agreement will not effect the rights and obligations of the parties accrued prior to the effective date of termination, including all monies due the Contractor for work accomplished. Said payment will become due and payable within 30 days.

**9. INDEMINIFICATION:**

Both parties shall mutually indemnify the other against harm from and against all losses, damages, injuries, liabilities, claims and expenses, unless such losses, damages, injuries, liabilities, claims and expenses are caused by the gross negligence or willful misconduct of Montgomery Jet Center/Southern Skies Airlines, Inc., resulting from, relating to, or arising out of (i) the performance of this Agreement by the Sponsor or (ii) claims of third parties relating to this Agreement.

**10. SUPPLEMENTS:**

Each party incorporates in this Agreement all and any provisions of implementation of Air Transportation Charter Service Agreement by Montgomery Jet Center/Southern Skies Airlines, Inc., not in conflict with this Agreement and obligates A US FED Group to terms and conditions set forth is such supplements not in conflict with this "Agreement" and are in compliance of regulatory agencies in Montgomery Jet Center/Southern Skies Airlines, providing Air Transportation Charter Service. Any or all terms in entered into by Montgomery Jet Center/Southern Skies Airlines, Inc., in

its implementation as Charter Carrier, must be approved by A US FED Group in writing prior to execution in a Memorandum of Understanding, a Supplement Appendix, or an addendum.

## 11. EXECUTION IN COUNTERPARTS:

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original, but all such counterparts shall together constitute one Agreement.

IN WITNESS WHEREOF, the parties hereto have duly executed or caused to be duly executed this Air Transportation Charter Service Agreement as of the date executed below.

**A US FED Group**
1201 Pennsylvania Avenue, North West
Suite 300
Washington, DC 20004

_____
Alex-St. James
Chief U.S. Policy Advisor
Original for A US FED Group
Date: 1/3/07

**Montgomery Jet Inc.
Center/Southern Skies Airlines,
Inc.**
4601 Richardson Road
Montgomery, AL 36108

_____
Ronald E. Mays
President & CEO
Original copy of Montgomery Jet
Center/Southern Skies Airlines, Inc.
Date: _____

///